John Donnelly & Sons, Inc. *v.* Outdoor Advertising Board.

1B J.W. Moore, Federal Practice par. 0.409 (2d ed. 1974). But cf. 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1357 at 614-616 (1969).

*Orders affirmed.*

John Donnelly & Sons, Inc. *vs.* Outdoor Advertising Board & another.[1]

Suffolk.    October 7, 1975. — December 15, 1975.

Present: Tauro, C.J., Reardon, Quirico, Braucher, & Wilkins, JJ.

*Billboard. Zoning,* Billboard. *Regulation. Constitutional Law,* Outdoor advertising, Police power, Due process of law. *Municipal Corporations,* By-laws and ordinances. *Brookline. Words,* "May require."

A by-law of the town of Brookline in effect prohibiting billboards, even in business districts, was not inconsistent with G. L. c. 93, § 29, or regulations of the Outdoor Advertising Board although State law generally protected billboards in commercial areas. [209-215]

By-law provisions excluding billboards from the town of Brookline for aesthetic reasons were not arbitrary, capricious or unreasonable despite the town's urban character. [216-225]

Town by-laws prohibiting billboards did not constitute an infringement of the limited protection of freedom of speech granted commercial advertising under the First Amendment. [225-228]

Bill in equity filed in the Superior Court on May 9, 1973.

The suit was heard by *Ronan,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Joseph J. Hurley* (*Edward P. Leibensperger* with him) for the petitioner.

*Ellyn R. Weiss,* Assistant Attorney General, for Outdoor Advertising Board.

---

[1] Town of Brookline, an intervener.

*Donald L. Connors* for the town of Brookline, intervener.

*Phillip Tocker,* for Outdoor Advertising Association of America, Inc., amicus curiae, submitted a brief.

TAURO, C.J.  The petitioner, John Donnelly & Sons, Inc. (Donnelly), appeals from a decree of the Superior Court affirming a decision of the Outdoor Advertising Board (the board) which denied renewal of twenty-two permits issued by the board for off-premise outdoor advertising signs maintained by Donnelly in business and industrial districts of the town of Brookline (the town). The board, in a decision dated April 5, 1973, found that the Donnelly signs were being maintained in violation of the town's zoning and sign by-laws.  Donnelly petitioned for judicial review of the board's decision under G. L. c. 30A, § 14, and the town intervened.  A judge of the Superior Court, after hearing argument, affirmed the decision of the board.

Donnelly has been engaged in the business of erecting and maintaining billboards, or what are often called off-premise or nonaccessory signs, since 1850.  It owns, operates, and maintains twenty-two such billboards, all constructed prior to 1960 in nonresidential districts in Brookline.  The billboards, which Donnelly leases for commercial advertising,[2] have been operated under permits issued annually by the board or its predecessor.

On November 16, 1967, art. XXIII (the "sign by-law") was unanimously adopted at a Brookline town meeting. The sign by-law was approved by the Attorney General on November 30, 1967, and became effective on December 7, 1967.  Section 4 of the by-law, set forth in the margin,[3] imposes various restrictions, including limita-

---

[2] Donnelly's general manager and vice-president testified that at any one time three to five per cent of its space is donated to public service advertising.

[3] "Section 4 — Non-Accessory Signs.  No person shall erect, display or maintain a non-accessory sign:  (a) On any premises located in a

tions as to size and location, on nonaccessory (off-premise) signs.[4]   Section 7(a) provides that the application of the sign by-law to off-premise signs is to be postponed for a period of five years from the effective date of the by-law. This five-year grace period for the removal of nonconforming signs expired on December 7, 1972.[5]

At a town meeting on December 13, 1971, Brookline adopted an amendment to its zoning by-law prohibiting "[a]ny advertising sign or device, including off-premise signs and non-accessory signs as defined in this By-law or the Sign By-law of the Town of Brookline" in any residential, industrial or business zone.   This provision was approved by the Attorney General on January 10, 1972, and became effective on January 22, 1972.

---

Residence District as designated by the Zoning By-law.   (b) Within any public way upon any property owned by the Town of Brookline or any other governmental body or agency.   (c) Within fifty (50) feet of any public way.   (d) Within three hundred (300) feet of any public park, playground, or other public grounds, if within view of any portion of the same.   (e) Within a radius of one hundred and fifty (150) feet from the point where the center lines of two or more public ways intersect.   (f) Upon the roof of any building.   (g) Exceeding an area of three hundred (300) square feet or a height of twelve (12) feet. (h) Containing visible moving or moveable parts or be lighted with flashing, animated, or intermittent illumination.

"This section shall not apply to signs exempted by Section 32 of Chapter 93 of the General Laws."

[4] Section 2 of the sign by-law defines an "accessory sign" as "[a]ny billboard, sign or other advertising device that advertises, calls attention to, or indicates the person occupying the premises on which the sign is erected or the business transacted thereon, or advertises the property itself or any part thereof as for sale or to let, and which contains no other advertising matter.   The words 'Accessory Sign' shall include an 'on premise' sign as defined and permitted by the Zoning By-law."

[5] Section 5 of the sign by-law authorizes the building commissioner, with the approval of the planning board and the board of selectmen, to permit nonaccessory signs in business or industrial districts in certain circumstances.   At a town meeting on October 24, 1972, it was voted to amend the sign by-law by striking § 5.   Although the amendment had not been approved by the Attorney General at the time of the hearing, the board assumed that no variance would be available to Donnelly.

On August 16, 1971, the executive secretary of the town informed the board of the December, 1972, deadline and requested that no permits or renewals be granted beyond that date. An adjudicatory hearing was held by the board at which both Donnelly and the town, represented by counsel, presented evidence. The board found that the zoning by-law had the effect of excluding off-premise signs from the town and assumed, as we do on appeal, that the sign by-law, although not prohibitory in terms, was in effect a prohibition of off-premise signs in the town's business districts. It concluded that the town's by-laws were neither an unreasonable exercise of the police power under the due process clause of the Fourteenth Amendment to the Constitution of the United States nor a violation of the First Amendment, as applied to the States by the Fourteenth Amendment. Further, the board decided that the prohibition of off-premise signs in Brookline, assumed by the board to have been enacted primarily for reasons of aesthetics, was consistent with the Massachusetts Constitution. Having upheld the by-laws, the board ruled that since Donnelly's billboards were in violation thereof, under its regulation 9K, set forth below,[6] the permits for the twenty-two billboards should be denied. A Superior Court judge upheld the board decision, and we affirm.

1. The petitioner contends that the town's prohibitory zoning and sign by-laws are invalid because they are

---

[6] In 1969, the board amended its regulations by adding § 9K, which reads: "No license or permit shall be granted for the location or maintenance of billboards . . . within a city or town, except where such location or maintenance is in conformity with applicable city and town . . . by-laws enacted in accordance with Section 29 of Chapter 93 of the General Laws; and no . . . by-law shall be deemed inconsistent with the rules and regulations of the Board on the ground that such ordinance or by-law prohibits the location or maintenance of a billboard . . . which in the absence of said . . . by-law would be in conformity with the said rules and regulations." The validity of § 9K was established in *John Donnelly & Sons, Inc.* v. *Outdoor Advertising Bd.*, 361 Mass. 746, 751-752 (1972).

inconsistent with State policy as embodied in the State Constitution, art. 50 of the Amendments, the State statute, G. L. c. 93, §§ 29-33, and the board's rules and regulations. In light of our prior decisions in the area of billboard regulations,[7] we cannot agree with this contention.

The power to regulate and restrict "[a]dvertising on public ways, in public places and on private property within public view" was conferred explicitly on the Legislature by art. 50 of the Amendments to the Constitution, adopted and ratified on November 5, 1918.[8] This amendment was discussed extensively in *General Outdoor Advertising Co.* v. *Department of Pub. Works,* 289 Mass. 149 (1935), where this court said: "The words used to confer that power are of broad import. Plainly, advertising of the kind there described has been designated by constitutional mandate as a subject of regulatory and restrictive legislation. No restraints on that power are expressed in the article. Every consideration for the promotion of the public interests which in view of its sweeping terms may reasonably be given weight by a

---

[7] *John Donnelly & Sons, Inc.* v. *Outdoor Advertising Bd.,* 361 Mass. 746 (1972). *Milton* v. *Donnelly,* 306 Mass. 451 (1940). *General Outdoor Advertising Co.* v. *Department of Pub. Works,* 289 Mass. 149 (1935).

[8] We recognize that a second, independent repository of local power to enact zoning ordinances regulating billboards may now exist by virtue of § 6 of the Home Rule Amendment, art. 89, of the Amendments to the Constitution. See *Collura* v. *Arlington,* 367 Mass. 881, 885 n.3 (1975); *Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dep't of Community Affairs,* 363 Mass. 339, 359 (1973). The only limit on this right of self-government granted by the Home Rule Amendment is that it not be exercised in a manner that is "inconsistent with the constitution or laws enacted by the general court . . . ." Art. 89, § 6. But since the parties in this case rely on art. 50, and G. L. c. 93, § 29, which requires that local billboard regulations be consistent with G. L. c. 93, §§ 29-33, and board rules and regulations, we confine our discussion here to whether the town by-laws fall within the power delegated to the town by the comprehensive statutory scheme dealing with outdoor advertising regulation.

lawmaking body may be taken into account and be a factor in framing regulations or restrictions." *Id.* at 158-159.

In the exercise of .the power granted by art. 50, the Legislature enacted G. L. c. 93, §§ 29-33, which, in part, authorizes the board to adopt "rules and regulations for the proper control and restriction of billboards . . . on public ways or on private property within public view of any highway, public park or reservation." G. L. c. 93, § 29, as appearing in St. 1955, c. 584, § 4. Excluded from the operation of the regulatory scheme are on-premise signs; "signs . . . which advertise or indicate either the person occupying the premises in question or the business transacted thereon . . . ." G. L. c. 93, § 30, as appearing in St. 1945, c. 233. Although primary responsibility for regulating outdoor advertising is en-trusted to the board, the Legislature "apparently recog-nized that the nature of the subject matter was such that it might not be adequately and appropriately controlled and supervised by general rules of State wide application, and that the physical characteristics of various cities and towns differ within such wide limits that it was deemed expedient to permit them to establish and enforce local regulations for the purpose of lessening the detrimental effect that the general welfare of the community might sustain by the erection and maintenance of billboards . . . ." *Milton* v. *Donnelly,* 306 Mass. 451, 455 (1940). Accordingly, the Legislature in G. L. c. 93, § 29, pro-vided that "[c]ities and towns may further regulate and restrict" off-premise signs in a manner not inconsistent with the State statute (G. L. c. 93, §§ 29-30) and board rules and regulations.

Our inquiry is whether Brookline's by-laws, found by the board to have the effect of prohibiting off-premise advertising in the town, come within the power delegated to the town. To be valid, the by-laws must comply with the enabling statute. *Lanner* v. *Board of Appeal of Tewksbury,* 348 Mass. 220, 228 (1964). *Caires* v. *Build-*

*ing Comm'r of Hingham*, 323 Mass. 589, 594 (1949). In the present case, the specific question is whether the local regulations are "inconsistent with principles clearly established by comprehensive State legislation or by authorized regulations." *John Donnelly & Sons, Inc. v. Outdoor Advertising Bd.*, 361 Mass. 746, 754 (1972) (hereinafter referred to as the "*Avon*" case).

In determining whether a local regulation is inconsistent with State legislation, it was said in *Commonwealth* v. *Baronas*, 285 Mass. 321, 323 (1934), that "[t]he mere existence of statutory provision for some matters within the purview of the by-law will not render it invalid as repugnant to law . . . ." See *Commonwealth* v. *Goodnow*, 117 Mass. 114 (1875). In *Bloom* v. *Worcester*, 363 Mass. 136, 154 (1973), this court said: "As a general proposition the cases dealing with the repugnancy or inconsistency of local regulations with State statutes have given considerable latitude to municipalities, requiring a sharp conflict between the local and State provisions before the local regulation has been held invalid." Further, it was recognized in *Milton* v. *Donnelly, supra* at 458, that the relation between the town and the State with regard to the billboard regulation is "more or less analogous to the power of the State to make regulations for certain phases of interstate commerce, which are valid until they are displaced or abrogated by an Act of Congress . . . ."

In deciding that the town's by-laws are not inconsistent with either the State statute or the board regulations, we note initially that the Legislature has provided explicitly for local regulation of billboards and that the board, in adopting § 9K, *supra* n. 6, has left wide latitude for local action. *Avon, supra* at 752. We do not agree, as argued by Donnelly, that since G. L. c. 93, § 29, provides that the board "may require" billboards to be located in business, commercial or industrial districts, it is the State policy to permit off-premise signs in those specified areas. The word "may" is commonly used to

import discretion, *Turnpike Amusement Park, Inc.* v. *Licensing Comm'n of Cambridge,* 343 Mass. 435, 437 (1962), and thus we interpret this provision as giving the board discretion to determine whether billboards should be confined to business or industrial zones and not mandating their existence in those districts.

The board, in adopting § 9K in 1969, exercised its discretion and changed its policy so as to give greater weight to local restrictions. *Avon, supra* at 751. Although § 5 of the board regulations defines its policy as permitting outdoor advertising in areas zoned for any business, industrial or commercial activity, § 9K is to be interpreted as controlling other provisions of the regulations. *Id.* at 752. It is now, under § 9K, of no importance that the board would grant a permit in the absence of a town by-law. That board regulations generally protect billboards in business and industrial areas[9] is of no consequence in light of § 9K which supersedes prior regulations. "The board, in effect, has decided no longer to preempt, by its regulations, the whole field of billboard control and has left wide scope for reasonable local regulation." *Ibid.* The fact that the town's by-laws go beyond the board regulations by not distinguishing between residential and business districts does not

---

[9] E.g., § 5 of the board regulations provides in part: "The Division [board] may grant permits for the erection of billboards . . . only in areas determined to be of a business character by the Division. The area in which the proposed billboard . . . is to be located may be determined to be of a business character (1) if the area is zoned by any city or town to permit any business, industrial or commercial activity or (2) with respect to areas, not so zoned, wherever there are two or more separate business, industrial or commercial activities conducted on . . . the proposed location of the billboard . . . or on other properties within a distance of 500 feet . . . from such proposed location . . . except as the Division may determine the area . . . to be predominantly residential or agricultural in use."

Section 6 reads in part: "Renewal permits shall be granted without notice or hearing . . . unless the billboard . . . is located in an area not zoned for any . . . activity which has been determined to have been of a business character . . . ."

render the by-laws inconsistent with the State statutes and the board regulations. *Milton* v. *Donnelly,* 306 Mass. at 458. *General Outdoor Advertising Co.* v. *Department of Pub. Works,* 289 Mass. 149, 197 (1935).

Having determined that municipalities may impose more stringent regulations covering business and industrial areas than the board does, we must decide whether the town, consistent with State law, may exclude off-premise signs from those areas. As noted above, the State's authority to regulate and restrict outdoor advertising is found in art. 50 of the Amendments to the Constitution, and this authority has been delegated in the same language to cities and towns in the last sentence of G. L. c. 93, § 29. We cannot conclude, as argued by Donnelly, that this power delegated to towns to regulate and restrict differs so substantially from the power to prohibit that the town's by-laws should be held invalid as inconsistent with State policy.

Article 50 conferred on the Legislature plenary power to regulate and restrict outdoor advertising. *General Outdoor Advertising Co.* v. *Department of Pub. Works, supra* at 158. Although the word "prohibit" was omitted from art. 50, it was recognized that the unlimited and unqualified power to regulate and restrict can be, for practical purposes, the power to prohibit "because under such a power the thing may be so far restricted that there is nothing left of it." 3 Debates in the Massachusetts Constitutional Convention, 1917-1918, at 661 (1918). Accord, 3 Debates at 670. The distinction between regulation and outright prohibition is often considered to be a narrow one: "'[t]hat regulation may take the character of prohibition, in proper cases, is well established by the decisions of this court . . . [citations omitted].'" *General Outdoor Advertising Co.* v. *Department of Pub. Works, supra* at 160, quoting from *United States* v. *Hill,* 248 U.S. 420, 425 (1919).

It was determined in the *General Outdoor Advertising Co.* case that the power to regulate and restrict is not the

power to prohibit utterly and without bound, but that art. 50 does "enable the prohibition of advertising on private property within public view in places, areas, divisions, localities or districts, but under present conditions not generally throughout the Commonwealth." 289 Mass. at 160.[10] Measured against this standard, we cannot say that a purely local ordinance prohibiting billboards within the locality, as is the case before us, is invalid.

In *General Outdoor Advertising Co.* v. *Department of Pub. Works, supra* at 197, a Concord billboard regulation extending to business districts, which Donnelly concedes was prohibitory in effect, was upheld by a unanimous court which found the by-law not inconsistent with the governing statute or the rules and regulations. Further, in *Milton* v. *Donnelly, supra* at 460, this court, although not faced with the question of total prohibition of all billboards, upheld a regulation that would prevent the erection of billboards exceeding five feet in height or eight feet in length in all business districts, excluding possibly a strip of land along the Neponset River. The board, in the present case, found that the above-mentioned by-laws upheld in Concord and Milton would necessitate the removal of all Donnelly's signs in Brookline, with the possible exception of one, if such by-laws had been enacted by Brookline.

Thus, we conclude that the town's by-laws are not inconsistent with the State law, G. L. c. 93, §§ 29-33, or board rules and regulations.

---

[10] The court reiterated this same standard on p. 180 of the *General Outdoor Advertising Co.* case that art. 50 establishes "'[a]dvertising . . . on private property within public view' as a proper subject for the exercise of the police power by regulation and restriction, which may extend to prohibition of such advertising in certain places, areas, divisions, localities and districts, though not utterly and without bound, throughout the Commonwealth." Accord, *General Outdoor Advertising Co., supra* at 183.

2. Donnelly contends that the town zoning and sign by-laws, which constitute a total exclusion of off-premise signs in Brookline, are both unreasonable and an impermissible exercise of the police power in violation of the due process clause of the Fourteenth Amendment. We treat these arguments together as they present similar issues, for a determination of what constitutes due process, in the context of this case, depends on the reasonableness of the legislation.

We believe that the principles governing the constitutionality of a local by-law or ordinance, adopted pursuant to G. L. c. 93, § 29, are the same as those governing the constitutionality of a zoning by-law or ordinance adopted under the authority granted by The Zoning Enabling Act, G. L. c. 40A. Although the town's by-laws are being enforced by the board and not by the town, our familiar rules are still applicable. The test for determining the constitutionality of a local zoning by-law is whether "its terms are 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" *Turnpike Realty Co.* v. *Dedham*, 362 Mass. 221, 233 (1972), quoting from *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 395 (1926). The by-law is to be presumed valid and, if its reasonableness is fairly debatable, the judgment of the local legislative body must be sustained. *Caires* v. *Building Comm'r of Hingham*, 323 Mass. 589, 594-595 (1949). Due regard is to be accorded to the expression of the residents of the town, who we must presume are familiar with the locality and its needs. *Id.* at 597. *Milton* v. *Donnelly*, 306 Mass. at 459. We will not substitute our judgment for that of the town unless its decision is shown to be arbitrary and capricious. *Ibid.*

We begin our inquiry by determining whether the town by-laws bear a reasonable relation to a permissible objective of the police power. In the past courts have upheld billboard regulations, including total prohibitions, primarily on the basis of traditional police power con-

cepts, such as the preservation of property values and the promotion of highway safety, and have relied only secondarily on aesthetic considerations. See *St. Louis Poster Advertising Co.* v. *St. Louis,* 249 U.S. 269 (1919); *Murphy, Inc.* v. *Westport,* 131 Conn. 292 (1944); *United Advertising Corp.* v. *Metuchen,* 42 N.J. 1 (1964); 1, 2 R. Anderson, American Law of Zoning §§ 7.12, 7.15, 11.76 (1968, Supp. 1975), and cases cited therein; 1, 4 N. Williams, American Land Planning Law cc. 11, 118-119 (1974), and cases cited therein. The reluctance to uphold zoning regulations, including billboard controls, designed to preserve and improve the visual character of the physical environment on aesthetic grounds alone may be based on the belief that aesthetic evaluations are a matter of individual taste and are thus too subjective to be applied in any but an arbitrary and capricious manner. See, e.g., *Mayor & City Council of Baltimore* v. *Mano Swartz, Inc.,* 268 Md. 79, 86-88 (1973). Accordingly, courts have engaged in a reasoning process, often amounting to nothing more than legal fiction, in order to avoid recognizing aesthetics as an appropriate basis for the exercise of the police power. See Dukeminier, Zoning for Aesthetic Objectives: A Reappraisal, 20 Law & Contemp. Prob. 218 (1955). We feel that this approach not only obscures the basic issues but also is no longer consistent with what we perceive as the modern trend in the law.

The board in its decision assumed that the town by-laws were adopted primarily for reasons of aesthetics and we find no indication in the record of any other reason for their enactment. Although the town argues that its by-laws can be upheld on the basis of public safety and traffic control, our review of the authorities indicates, at best, conflicting support for this proposition. See, e.g., Holme, Billboards and On-Premise Signs: Regulation and Elimination under the Fifth Amendment, Institute on Planning, Zoning, and Eminent Domain 247, 263-265 (1974). Therefore, the issue squarely

before us is whether the town by-laws, adopted primarily or solely for aesthetic reasons, are within the scope of the police power. We conclude that aesthetics alone may justify the exercise of the police power; that within the broad concept of "general welfare," cities and towns may adopt reasonable billboard regulations designed to preserve and improve their physical environment.

We live in a changing world where the law must respond to the demands of a modern society. As stated in *Euclid* v. *Ambler Realty Co.*, 272 U.S. at 387, "[W]hile the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation." What was deemed unreasonable in the past may now be reasonable due to changing community values. Among these changes is the growing notion that towns and cities can and should be aesthetically pleasing; that a visually satisfying environment tends to contribute to the well-being of its inhabitants. Recognizing the value of a beautiful city, the United States Supreme Court, in *Berman* v. *Parker*, 348 U.S. 26 (1954), adopted the view that the general welfare embraces aesthetic considerations. "The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." *Id.* at 33. See *Belle Terre* v. *Boraas*, 416 U.S. 1 (1974). Although *Berman* involved the use of eminent domain, this expansive view of the general welfare is applicable to the zoning power.[11]

---

[11] This court in *Avon, supra* at 754-755 n.9, cited *Berman,* among other cases, as indicating a broadening of the permissible basis of land use regulation.

In addition to this judicial expansion of the concept of "general welfare," we note that our Legislature, reflecting the growing concern for the environmental quality of life, adopted art. 97 of the Amendments to the Constitution of the Commonwealth, which was ratified on November 7, 1972, in order to establish as State policy the right of the people to "the natural, scenic, historic, and esthetic qualities of their environment . . . ." This recognition of the importance of an aesthetic environment is also reflected in The Zoning Enabling Act, G. L. c. 40A, § 3, inserted by St. 1954, c. 368, § 2, which provides that zoning regulations shall be designed to "preserve and increase . . . amenities" within a city or town. Further, it is apparent from 3 Debates in the Massachusetts Convention, 1917-1918, 621-672 (1918), that art. 50 of the Amendments to the Constitution, which defines the State constitutional limitations on outdoor advertising regulation, was introduced because of a general concern that billboards were a blight on the landscape. *Id.* at 622-624. A State legislator, in introducing the amendment, said, "I am proud to say that this resolution is based largely upon aesthetic considerations, which, being translated into Anglo-Saxon, means nothing more nor less than considerations of beauty." *Id.* at 623. Thus, we find a continuing interest in the Commonwealth in the improvement of the aesthetic environment of both cities and towns. Although these pronouncements are not determinative of the constitutionality of Brookline's by-laws under the due process clause, they are a strong indication that citizens in this State consider visual pollution, including billboards, to be a detriment to the general welfare.

The position we announce today in no way marks a radical departure from our prior cases dealing with outdoor advertising regulation. In the 1935 case of *General Outdoor Advertising Co.* this court affirmed the proposition that outdoor advertising may be restrained in the interest of aesthetics. "Even if the rules and regula-

tions of billboards and other advertising devices did not rest upon the safety of public travel and the promotion of the comfort of travellers by exclusion of undesired intrusion, we think that the preservation of scenic beauty and places of historical interest would be a sufficient support for them. Considerations of taste and fitness may be a proper basis for action in granting and in denying permits for locations for advertising devices." 289 Mass. at 187. In *Lexington* v. *Govenar,* 295 Mass. 31, 36 (1936), it was said: "Doubtless aesthetic considerations play a large part in determining that advertising signs should not be permitted in such . . . [a residential district] — these would seem sufficient to exclude such a use." In expressing the opinion that the proposed legislation establishing historic districts in the town of Nantucket was constitutional, the court noted the growing tendency to give more weight to aesthetic considerations. *Opinion of the Justices,* 333 Mass. 773, 779 (1955). Further, as stated by Justice Cutter, in *Avon,* 361 Mass. at 754-755 n.9: "[G]overnmental and constitutional power . . . to restrict and regulate billboards, even principally on aesthetic grounds, has become generally established and has expanded greatly."

Admittedly, there is disagreement among the jurisdictions concerning aesthetic zoning, but we perceive a significant trend in the recent cases toward giving full recognition to aesthetics as a proper basis for land use regulations. See 1 A. Rathkopf, Zoning and Planning § 14.01 (4th ed. 1975). 1 N. Williams, American Land Planning Law c. 11 (1974). Annot., 21 A.L.R.3d 1222 (1968). For instance, Oregon adopted the approach that an ordinance based solely on aesthetics is valid, saying that "there is a growing judicial recognition of the power of a city to impose zoning restrictions which can be justified solely upon the ground that they will tend to prevent or minimize discordant and unsightly surroundings. This change in attitude is a reflection of the refinement of our tastes and the growing appreciation

of cultural values in a maturing society." *Oregon City v. Hartke,* 240 Ore. 35, 46-47 (1965). In a recent decision by the New Jersey Superior Court, aesthetic zoning was upheld in a case involving a total prohibition of billboards of a certain size. *Westfield Motor Sales Co. v. Westfield,* 129 N.J. Super. 528 (1974). The court suggested that "[l]ess confusion will result if the courts accept aesthetic zoning *per se,* instead of purporting to accept it and then dismissing it as inadequate." *Id.* at 543. See also *E.B. Elliott Advertising Co. v. Metropolitan Dade County,* 425 F.2d 1141 (5th Cir. Fla.) cert. dismissed, 400 U.S. 805 (1970); *State v. Diamond Motors, Inc.,* 50 Hawaii 33 (1967); *Jasper v. Commonwealth,* 375 S.W.2d 709 (Ky. App. 1964); *Mississippi State Highway Comm'n v. Roberts Enterprises, Inc.,* 304 So. 2d 637 (Miss. 1974); *Cromwell v. Ferrier,* 19 N.Y.2d 263 (1967). 1 A. Rathkopf, Zoning and Planning, *supra,* and cases cited therein. Legal commentators have also argued persuasively for the acceptability of aesthetics as a permissible objective of the police power,[12] especially in the area of billboard regulation.[13]

Although we conclude that aesthetic objectives may support local regulation of billboards, the question remains whether the town by-laws should be declared invalid because the means employed bear no reasonable relationship to the aim sought to be accomplished. *Mil-*

---

[12] See, e.g., Dukeminier, Zoning for Aesthetic Objectives: A Reappraisal, 20 Law & Contemp. Prob. 218 (1955); Masotti & Selfon, Aesthetic Zoning and the Police Power, 46 J. Urban L. 773 (1969); Norton, Police Power, Planning and Aesthetics, 7 Santa Clara Lawyer 171 (1967); Comment, Zoning, Aesthetics, and the First Amendment, 64 Colum. L. Rev. 81 (1964); Note, Beyond the Eye of the Beholder: Aesthetics and Objectivity, 71 Mich. L. Rev. 1438 (1973); Aesthetic Regulation of the Urban Environment, 6 Urban Lawyer 622 (1974).

[13] Moore, Regulation of Outdoor Advertising for Aesthetic Purposes, 8 St. Louis U.L.J. 191 (1963). Rodda, The Accomplishment of Aesthetic Purposes under the Police Power, 27 S. Cal. L. Rev. 149, 168-177 (1954). Note, Municipal Corporations: Sign Control Through Municipal Zoning Ordinance, 27 Okla. L. Rev. 735 (1974).

*ton* v. *Donnelly,* 306 Mass. 451, 459 (1940). In this respect, Donnelly argues that a total prohibition of off-premise signs in a town such as Brookline, which can appropriately be characterized as an urban environment, constitutes as invalid exercise of the police power. Again, we must disagree.

We have recognized, and Donnelly concedes, that prohibition of billboards is permissible in proper circumstances. See *General Outdoor Advertising Co.* v. *Department of Pub. Works,* 289 Mass. 149, 160, 180, 183 (1935). Donnelly contends that a total prohibition may be reasonable in a rural community with no real business district but not in an urban community. But can we say that residents of an urban area are not entitled to the benefits of an aesthetic environment while those in a rural district are? We think not.

It is well settled that even a legitimate business or occupation may be restricted or prohibited in the public interest. *General Outdoor Advertising Co.* v. *Department of Pub. Works, supra* at 210. *Breard* v. *Alexandria,* 341 U.S. 622, 632-633 (1951). For instance, in *Oregon City* v. *Hartke,* 240 Ore. 35, 50 (1965), the court upheld the total exclusion of car wrecking businesses, saying that "[i]t is not irrational for those who must live in a community from day to day to plan their physical surroundings in such a way that unsightliness is minimized." Moreover, in the area of billboard regulation, although the results have not been uniform, a city-wide prohibition of off-premise signs has been upheld in *Murphy, Inc.* v. *Westport,* 131 Conn. 292 (1944), *United Advertising Corp.* v. *Metuchen,* 42 N.J. 1 (1964), *United Advertising Corp.* v. *Borough of Raritan,* 11 N.J. 144 (1952), and *Cromwell* v. *Ferrier,* 19 N.Y. 2d 263 (1967). Contra, *Metromedia, Inc.* v. *Des Plaines,* 26 Ill. App. 3d 942 (1975); *Norate Corp.* v. *Zoning Bd. of Adjustment,* 417 Pa. 397 (1965). In addition, Hawaii enacted in 1965 a flat prohibition of all off-premise commercial advertising. Hawaii Rev. Laws § 445-112. This court, in

*General Outdoor Advertising Co.* v. *Department of Pub. Works, supra* at 197, upheld a Concord by-law which had the effect of prohibiting billboards throughout the town. See also *Milton* v. *Donnelly, supra* at 460, where the court validated a stringent, if not prohibitory, billboard regulation, citing *Euclid* v. *Ambler Realty Co.,* 272 U.S. 365 (1926), which upheld a zoning ordinance excluding billboards from four of the six zoning districts.

If it is reasonable totally to prohibit billboards in Concord, *General Outdoor Advertising Co.* v. *Department of Pub. Works, supra* at 197, and to prohibit billboards in residential areas, *Thomas Cusack Co.* v. *Chicago,* 242 U.S. 526 (1917), we cannot say that it is arbitrary and unreasonable for Brookline to exclude billboards from its community. We believe that it is within the scope of the police power for the town to decide that its total living area should be improved so as to be more attractive to both its residents and visitors. Whether an area is urban, suburban, or rural should not be determinative of whether the residents are entitled to preserve and enhance their environment. Urban residents are not immune to ugliness. As noted by the New Jersey Superior Court in *Westfield Motor Sales Co.* v. *Westfield,* 129 N.J. Super. 528, 544 (1974), "Those who live in an urban megalopolis are no strangers to the jungle of signs which daily compete for their attention. . . . [A] municipality may perceive that a plethora of signs of a certain size, no matter how tasteful, can have an undesirable cumulative effect upon the well-being of the entire community." Moreover, in a densely populated area,[14] it is unlikely that districts are distinctively residential or business; people's homes are often within close proximity to business areas. Thus, the quality of the living environment of these residents cannot be

---

[14] Brookline covers an area of six square miles and has a population of 58,689. See Manual for the General Court, 1973-1976, at 291.

improved without considering both the residential and business areas.

A city-wide prohibition of billboards can also be justified on the ground that a community has a legitimate interest in improving the aesthetic quality of its business districts, as well as its residential districts. Cf. *Schloss* v. *Jamison,* 262 N.C. 108, 116-117 (1964). There is no reason why the notion of beauty should be inimical to a business area. As argued by Judge Finch in his dissent in *In re Mid-State Advertising Corp.* v. *Bond,* 274 N.Y. 82 (1937), which has since become the prevailing view in New York (*Cromwell* v. *Ferrier, supra* at 268): "Perhaps factories, stores and the industrial sections of a city naturally tend to be ugly, but it does not follow that business may not be carried on amid more pleasant surroundings. Certainly any city enacting such an ordinance would present a more pleasing picture to the eye than one plastered with blatant signboards. . . . A city might well conclude that it is more likely to attract commercial enterprises and permanent residents if it improves its appearance; that its residents will gain financially by such improvement; or that the elimination of distracting and annoying billboards will add to the physical and mental well-being of its inhabitants. . . . The billboard eyesore is in many ways akin to annoying sounds and undesirable odors which undoubtedly can be prohibited. Although such restrictions may be more desirable in residential areas, nevertheless, their extension to business districts cannot be termed unreasonable." *Id.* at 89. See *E.B. Elliot Advertising Co.* v. *Metropolitan Dade County,* 425 F.2d 1141, 1152 (5th Cir. 1970). We agree with Judge Finch's reasoning, for to conclude that an area is too unattractive to justify aesthetic improvement would be both unreasonable and illogical.

It is for the locality to determine the character and quality of its visual environment, and it is not the court's function to decide which towns may preserve or improve their appearance. It is the court's rule to set aside the

town's determination only when it is arbitrary and capricious, *Milton* v. *Donnelly*, 306 Mass. 451, 459 (1940), and in the instant case we cannot conclude that the town has acted unreasonably by excluding off-premise advertising from its borders.

Donnelly, operating for generations, has had many years to contemplate and prepare for changes in its special mode of doing business. The volume of litigation and legislation in this area here and elsewhere over the past decades has given a clear indication of the ever increasing objections to billboard advertising whether it be in rural or urban communities. Donnelly cannot now argue with persuasion that by-laws or ordinances prohibiting such signs are arbitrary, capricious or unreasonable because of the impact on its business.[15] Such legislative enactments reflect the growing sensitivity to the serious effect billboards have on the aesthetics of a locality. The time has come to recognize that citizens have a right, within certain limitations, to make these decisions concerning their own communities.

Donnelly further argues that the town by-laws violate the Fourteenth Amendment in that a total exclusion of billboards constitutes an infringement of the First Amendment guaranty of freedom of speech. The board, rejecting this argument, concluded that there were no First Amendment restraints on governmental regulation of purely commercial advertising. Although the commercial speech doctrine has been clarified since the board decision, see *Bigelow* v. *Virginia*, 421 U. S. 809 (1975), we are of the opinion that, despite this recent case, the

---

[15] We note that in 1968 a total of $208,000,000 was spent on outdoor advertising throughout the country. This amounted to approximately 1.6% of the total expenditure for all advertising. In both 1969 and 1970, this ratio of outdoor advertising expenditures to total industry expenditures remained almost constant. 4 N. Williams, American Land Planning Law c. 118, at 568 n.2 (1974), citing Statistical Abstract of United States 757 (1970). See *Cromwell* v. *Ferrier*, 19 N.Y. 2d 263, 272 (1967).

town by-laws do not amount to a deprivation of free speech.

We now recognize that commercial advertising is not stripped of all First Amendment protection. *Bigelow* v. *Virginia, supra* at 818, 826. Nonetheless, there are degrees of protection accorded speech and, depending on the circumstances, a State may legitimately regulate or even prohibit advertising if the First Amendment interest is outweighed by the governmental interest. *Id.* at 826. Unlike the *Bigelow* case, where the newspaper advertisement relating to the availability of abortions in New York was considered to be something more than a normal commercial proposal, *id.* at 821-822, the Donnelly signs were found by the board to "contain purely commercial copy." Although off-premise signs are sometimes used for public service advertising,[16] this activity can be considered only as incidental to Donnelly's primary function, the leasing of space for commercial or product advertising and not the dissemination of ideas or the communication of information. As stated by Mr. Justice Blackmun in *Bigelow*, "To the extent that commercial activity is subject to regulation, the relationship of speech to that activity may be one factor, among others, to be considered in weighing the First Amendment interest against the governmental interest alleged." *Id.* at 826.

Regardless of the extent to which constitutional protection is afforded commercial advertising, a question left unanswered by *Bigelow, ibid.*, we believe that due to the intrusive quality of billboards,[17] passers-by, whether

---

[16] See n.2 *supra.*

[17] This court, in *General Outdoor Advertising Co.* v. *Department of Pub. Works*, 289 Mass. 149 (1935), described outdoor advertising as follows: "It does not appeal alone to the desire or consent of such persons [traveling on highways]; it is forcibly thrust upon the attention of all such persons, whether willing or averse. For such persons who strongly wish to avoid advertising intrusion, there is no escape; they cannot enjoy their natural and ordinary rights to proceed unmolested." *Id.* at 168.

willing or not, are compelled to see the advertisements. The advertiser's message is thrust upon them as a captive audience in violation of the "cardinal principle . . . that no person can be compelled to listen [or hear] against his will." T. Emerson, The System of Freedom of Expression 710 (1970). This principle was recognized by the United States Supreme Court in *Erznoznik* v. *Jacksonville,* 422 U.S. 205, 209 (1975), *Bigelow* v. *Virginia, supra* at 828, and *Lehman* v. *Shaker Heights,* 418 U.S. 298, 302 (1974). In *Lehman,* Mr. Justice Blackmun reaffirmed the view, first expressed in *Packer Corp.* v. *Utah,* 285 U.S. 105, 110 (1932), that "viewers of billboards and streetcar signs [have] no 'choice or volition' to observe such advertising and [have] the message 'thrust upon them by all the arts and devices that skill can produce. . . . The radio can be turned off, but not so the billboard or street car placard.'" 418 U.S. at 302. Thus, we conclude that the streetcar placards in *Lehman* and the billboards in this case fall within the same category and, as such, the petitioner has no constitutional right to use billboards to "spread . . . message[s] before [a] captive audience." *Id.* at 308. (Douglas, J., concurring.)

Further, we note that the present case is analogous to *Kovacs* v. *Cooper,* 336 U.S. 77 (1949), where the Court upheld a prohibition of the use of sound trucks. The town by-laws, as was the case in *Kovacs,* do not regulate the content of ideas expressed, but rather protect individuals from highly distracting and intrusive communications. It is well established that a "State or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations applicable to all speech irrespective of content." *Erznoznik* v. *Jacksonville, supra* at 209, and cases cited. "To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself." *Kovacs* v. *Cooper, supra* at 88.

We find support for our conclusion in *Markham Advertising Co.* v. *Washington,* 73 Wash. 2d 405 (1968),

where the Washington Supreme Court rejected an argument similar to the one urged by Donnelly, and decided that a State billboard regulation did not constitute a denial of free speech. *Id.* at 429. The United States Supreme Court subsequently dismissed an appeal of the *Markham* case for want of a substantial Federal question. *Markham Advertising Co.* v. *Washington,* 393 U.S. 316, rehearing denied, 393 U.S. 1112 (1969).

Thus, we conclude that the petitioner's minimal free speech interest does not outweigh the interests of the unwilling audience.

*Decree affirmed.*